TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 95-1009 |
| of | : | |
| | : | September 11, 1996 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

_____


THE HONORABLE RUBEN S. AYALA, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following question:

When a mosquito abatement district or vector control district discovers the presence of a fly problem involving an agricultural operation, does the district have an affirmative duty to determine whether the agricultural operation constitutes a public nuisance in producing "excessive" domestic fly larval development and adult fly emergence on the property before initiating a formal nuisance abatement action against the agricultural operation?

CONCLUSION

When a mosquito abatement district or vector control district discovers the presence of a fly problem involving an agricultural operation, the district does not have an affirmative duty to determine whether the agricultural operation constitutes a public nuisance in producing "excessive" domestic fly larval development and adult fly emergence on the property before initiating a formal nuisance abatement action against the agricultural operation.

ANALYSIS

The Legislature has enacted a comprehensive statutory scheme (Health & Saf. Code, §§ 2200-2360; "Act")[1] authorizing mosquito abatement districts and vector control districts to take all

_____

[1] All section references hereafter are to the Health and Safety Code.

steps necessary to control mosquitoes, flies, and other vectors[2] and abate nuisances involving their breeding places (§ 2270). We are asked to determine whether such a district may institute a formal nuisance abatement action against an agricultural operation for causing a breeding place for flies without first determining whether the operation is producing "excessive" larval development and adult fly emergence on the property. For the reasons which follow, we conclude that such determination need not first be made.

The board of trustees of a mosquito abatement or vector control district is empowered to "[a]bate as nuisances all standing water and other breeding places for mosquitoes, flies, or other vectors, either in the district or in territory not in the district but so situated with respect to the district that mosquitoes, flies, or other vectors from the territory disperse into the district." (§ 2270, subd. (b).) It is also expressly authorized to "[e]nter upon any property without hindrance or notice, either within the district or so reasonably adjacent thereto that vectors may disperse into the district, . . . [t]o abate public nuisances in accordance with [sections 2270-2294] either directly or by giving notice to the property owner to abate a nuisance." (§ 2270, subd. (f)(2).)

The Act authorizes abatement actions as follows: (1) the district gives notice to the property owner of the existence of the nuisance (§§ 2274-2279); (2) the owner may request and obtain a hearing before the district board (§ 2280); (3) the owner may request and obtain judicial review of the board's decision (§ 2280.1); (4) if the owner does not abate the nuisance as directed, the district may do so "by destroying the larvae or pupae and by taking appropriate measures to prevent the recurrence of further breeding" (§ 2282); (5) the owner is subject to a $500 penalty for each day of not abating the nuisance as directed (§§ 2775, subd. (c); 2280); and (6) the owner is subject to costs for abatement actions undertaken by the district (§ 2283). Alternatively, the district board may follow a different statutory scheme (§§ 2800-2910), but one which has similar procedures (§§ 2856-2868). (§ 2273.)

Section 2274 provides:

"Whenever a nuisance specified in this chapter exists upon any property, either in the district or in territory not in the district but so situated with respect to the district that mosquitoes, flies, or other vectors from the territory disperse into the district, the district board may notify in writing the owner or party in possession, or the agent of either, of the existence of the nuisance."

Section 2275 states:

"The notice shall do all of the following:

"(a) State the finding of the district that a public nuisance exists on the property and the location of the nuisance on the property.

---

[2] "`Vector' means any animal capable of transmitting the causative agent of human disease or capable of producing human discomfort or injury, including, but not limited to, mosquitoes, flies, other insects, ticks, mites, and rats, but not including any domesticated animal." (§ 2200, subd. (f).)

"(b) Direct the owner or party in possession to take appropriate steps to eliminate, or prevent the recurrence of, the nuisance.

"(c) Inform the owner or party in possession that failure to comply with the requirements of subdivision (b) shall subject the owner or party in possession to civil penalties of not more than five hundred dollars ($500) per day for each day the nuisance continues after the time specified for the abatement of the nuisance in the notice.

"(d) Inform the owner or party in possession that before complying with the requirements of the notice, the owner or party in possession may appear at a hearing before the district board at a time and place stated in the notice."

Section 2280 provides:

"Before complying with the requirements of the notice the owner or party in possession may appear at a hearing before the board at a time and place fixed by the board and stated in the notice. At the hearing the district board shall determine whether the initial finding as set forth in the notice is correct and shall permit the owner or party in possession to present testimony in his behalf. If, after hearing all the facts, the board makes a determination that a nuisance exists on the property, the board shall order compliance with the requirements of the notice or with alternate instructions issued by the board.

"Any failure to comply with any order of the board issued pursuant to this section shall subject the owner or party in possession to civil penalties as determined by the discretion of the board which shall not exceed five hundred dollars ($500) per day for each day such order is not complied with."

The appropriate procedure by which a vector control district may abate a public nuisance is determined by the cause of the nuisance involved. Section 2272 states:

"Except as otherwise provided in Section 2272.5, a public nuisance may be abated in any action or proceeding by any remedy provided by [sections 2200-2360] or any other provision of law."

Section 2272.5 provides:

"Section 2272 shall not apply to a public nuisance which exists at an agricultural operation by reason of excessive domestic fly larval development and excessive adult fly emergence as defined in subparagraph (C) of paragraph (1) of subdivision (e) of Section 2200. An agricultural nuisance described in this section may be abated in any action or proceeding only by the remedies provided by [sections 2200-2360]. [Sections 2200-2360] shall provide the exclusive source of costs and civil penalties which may be assessed by reason of the agricultural nuisance against the owner or operator of an agricultural operation at which the nuisance is found to exist."

Accordingly, while most public nuisances may be abated under the Act's provisions "or any other provision of law," a public nuisance at an agricultural operation producing excessive domestic fly larval development and excessive adult fly emergence on the property may only be abated under the Act's provisions.

For purposes of the Act, "public nuisance" is defined in section 2200, subdivision (e), to mean any of the following:

"(1)(A)  Any breeding place for mosquitoes, flies, or other vectors of public health importance which exists by reason of any use made of the land on which it is found, or of any artificial change in its natural condition.  Presence of immature arthropods of public health importance shall constitute prima facie evidence that a place is a breeding place for arthropods.

"(B)  If the board determines that an agricultural operation is growing or processing crops or raising fowl or animals in a manner consistent with proper and accepted practices and standards, as established and followed by similar agricultural operations in the same locality, and employing measures for fly control, for manure management, removal, and disposal, and for disposal of agricultural crop waste, which prevent excessive domestic fly larval development and excessive adult fly emergence on the property, then that place shall not be deemed a public nuisance.

"(C)  As used in this paragraph, `excessive' means the presence of domestic flies associated with agricultural operations, which do all of the following:

"(i)  Occur in immature stages and as adults in numbers considerably in excess of those found in the surrounding environment.

"(ii)  Are associated with the design, layout, and management of agricultural operations.

"(iii)  Disseminate widely from the property.

"(iv)  Cause detrimental effects on the public health and well-being of a majority of the surrounding population, as determined by the board.

"(2)  Water which is a breeding place for mosquitoes, flies, or other arthropods of public health importance.

"(3)  The presence of rodents or evidence of rodent activity, such as rodent droppings, trails, or evidence of feeding activity."

If a mosquito abatement or vector control district thus determines that an agricultural operation, due to its management practices, does not produce "excessive domestic fly larval development and excessive

adult fly emergence," the operation is not a public nuisance subject to abatement. (§ 2200, subd. (e)(1)(B).)

The issue to be resolved concerns the application of these statutes when a district finds that an agricultural operation constitutes a "breeding place for . . . flies." (§ 2200, subd. (e)(1)(A).) Must it then make a determination whether the operation's practices and procedures "prevent excessive domestic fly larval development and excessive adult fly emergence on the property" (§ 2200, subd. (e)(1)(B)) before it undertakes an abatement action?

In analyzing and applying the provisions of the Act, we rely on various principles of statutory construction. "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statutes themselves, giving to the language its usual, ordinary import . . . ." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.) "'Statements in legislative committee reports concerning statutory purposes which are in accordance with a reasonable interpretation of the statute will be followed by the courts. It will be presumed that the Legislature adopted the proposed legislation with the intent and meaning expressed in committee reports.'" (*O'Brien* v. *Dudenhoeffer* (1993) 16 Cal.App.4th 327, 334.) "It is well established that statutes must be given a reasonable construction that conforms to the apparent purpose and intention of the law makers [citations] and the various parts of the statutory enactment must be harmonized by considering the particular clause in the context of the whole statute." (*Nunn* v. *State of California* (1984) 35 Cal.3d 616, 624-625.) "'" Exceptions to the general rule of a statute are to be strictly construed. In interpreting exceptions to the general statute courts include only those circumstances which are within the words and reason of the exception. . . . One seeking to be excluded from the sweep of the general statute must establish that the exception applies." [Citation.]' [Citation.]" (*City of Lafayette* v. *East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1017.) Finally, "it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166.)

With these principles in mind, we return to the language of sections 2200 and 2272.5. It is clear that the Legislature intended for certain agricultural operations (those with fly problems) to receive special consideration under the Act's provisions. Such operations are not public nuisances if a district is able to make various findings indicating that the fly problem is not "excessive." (§ 2200, subd. (e)(1)(B).) Section 2200 does not require a district to make a determination before instituting an abatement action. Rather, *if* a district determines that an excessive fly problem does *not* exist, the operation is deemed *not* to be a public nuisance.

The owners of an agricultural operation are in the best position to establish that they are following "proper and accepted practices and standards" and are employing measures "which prevent excessive domestic fly larval development and excessive adult fly emergence on the property." (§ 2200, subd. (e)(1)(B).) If they can establish these conditions to the satisfaction of a district, the operation is deemed not to be a public nuisance. The Act allows for such demonstration of proper practices, standards, and measures by a property owner. As previously quoted, section 2280 authorizes a landowner to appear at a board hearing "to present testimony in his behalf."

Our construction of the language of section 2200 is consistent with the apparent legislative purposes in amending the statute in 1984 (Stats. 1984, ch. 1085, § 1) which added the terms in question. The report of the Senate Committee on Local Government dated August 8, 1984, described the proposed amendment as follows:

"The laws regarding mosquito abatement districts and vector control districts define as a `public nuisance' a place where mosquitoes, flies, or other insects breed. The presence of their larvae or pupae is prima facie evidence that the property is a breeding place. If a district alleges that a property is a public nuisance because it is an insect breeding place, current law requires the district to conduct a noticed public hearing before ordering the property owner to abate the nuisance.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Assembly Bill 2811 says that the public nuisance definition does not apply to agricultural operations if a district's board determines that the operation is being conducted with `proper and accepted practices and standards' and if it uses measures to prevent the `excessive' development of flies."

We view the legislative history of section 2200 as supporting our conclusion that an abatement action may be undertaken at an agricultural operation without first determining whether the fly problem is "excessive."

The terms and conditions of section 2272.5 do not change our construction of section 2200. Section 2272.5 is an exception to a general statute (§ 2272) and thus must be narrowly construed. It restricts a district's choices in abating a public nuisance at an agricultural operation due to an "excessive" fly problem. As previously quoted, no "provision of law" other than the Act's provisions may be invoked in such circumstances. We have examined in detail the legislative history of the enactment of section 2272.5 in 1987. (Stats. 1987, ch. 112, § 3.) It is apparent that the Legislature was concerned that agricultural operations were being subjected to larger fines than the $500 per day penalty allowed under the Act. For example, the report of the Assembly Committee on Local Government for its hearing on March 29, 1987, stated:

"AB 761 is sponsored by the California Farm Bureau Federation. The Farm Bureau believes that references to "any other law" in Section 2272 of the Health and Safety Code can result in the application of other penalties, such as those of the Business and Professions Code, for public nuisances caused by mosquitoes or other vectors. Specifically, the Farm Bureau cites a situation in Stanislaus County where fines were levied against a ranch under sections of the Business and Professions Code relating to unfair business practices, with a maximum penalty of $2,500 per day."

We construe section 2272.5 in a manner that would limit the amount of the penalty imposed upon an agricultural operation for causing a "breeding place for . . . flies" (§ 2200, subd. (e)(1)(A)) to $500 per day.

We conclude that when a mosquito abatement district or vector control district discovers the presence of a fly problem involving an agricultural operation, the district does not have an affirmative duty to determine whether the agricultural operation constitutes a public nuisance in producing "excessive" domestic fly larval development and adult fly emergence on the property before initiating a formal nuisance abatement action against the agricultural operation.

* * * * *